## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

TERESA ELAINE ADDISON,            )
                                    )
         **Plaintiff,**          )
                                      )
**v.**                                 )         **CIVIL ACTION NO. 5:10-0228**
                                      )
**MICHAEL J. ASTRUE,**         )
**Commissioner of Social Security,**   )
                                      )
         **Defendant.**        )

### PROPOSED FINDINGS AND RECOMMENDATION

       This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB), under Title II of the Social

Security Act, 42 U.S.C. §§ 401-433. By Standing Order entered March 5, 2010 (Document No. 4.),

this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and

evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant

to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for

Judgment on the Pleadings (Document Nos. 10 and 11.) and Plaintiff's Reply. (Document No. 12.)

       The Plaintiff, Teresa Elaine Addison (hereinafter referred to as "Claimant"), filed an

application for DIB on March 30, 2007, alleging disability as of March 15, 2006, due to "anxiety,

depression, arthritis, problems with varicose veins in both legs, high blood pressure, bursitis in right

shoulder, right hip problems, stress urinary in[continence], fungi on right fingernail and both toes,

problems walking, hair loss, and breathing problems.[1] (Tr. at 13, 105-07, 160.) The claim was denied

---

       [1] Plaintiff protectively filed prior applications for DIB and Supplemental Security Income
[SSI] on August 17, 2006, alleging disability as of March 15, 2006. (Tr. at 13, 99-103, 111.)  The
claims were denied at the initial level on October 17, 2006. (Tr. at 49-51, 54-56, 111.)

initially and upon reconsideration. (Tr. at 59-61, 68-70.) On October 19, 2007, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 71-72.) The hearing was held on May 27, 2008, before the Honorable Jon K. Johnson. (Tr. at 26-42.) By decision dated July 18, 2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 13-25.) The ALJ's decision became the final decision of the Commissioner on January 28, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on March 4, 2010, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall

2

v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, March 15, 2006. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from osteoarthritis of the right hip and knees, obesity, and polyarthralgia of undetermined etiology, which were a combination of severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 20, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary level work as follows:

> The [C]laimant can lift and/or carry (including upward pulling) up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk two to three hours during an eight-hour workday (with normal breaks); sit about six hours in an eight hour workday (with normal breaks); perform unlimited pushing and pulling (including operation of hand and/or foot controls), other than as limited in lifting and carrying by weight; perform frequent stooping; perform occasional kneeling, crouching, crawling, balancing, and climbing ramps, stairs, ladders, rope, and scaffolds; perform unlimited reaching in all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors). She can tolerate unlimited exposure to extreme cold; extreme heat; wetness; humidity; noise; fumes, odors, gases, poor ventilation, etc.; and hazards (machinery, heights, etc.). She must avoid concentrated exposure to vibration.

3

(Tr. at 20-21, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 23, Finding No. 6.) On the basis of Medical Vocational Rules 201.28 and 201.29, benefits were denied. (Tr. at 24-25, Finding Nos. 10 and 11.)

Claimant's Background

Claimant was born on February 12, 1964, and was 44 years old at the time of the administrative hearing, May 27, 2008. (Tr. at 24, 105.) Claimant has a high school education. (Tr. at 24, 159,166.) In the past, Claimant worked as a folder for a pantyhose company, a flower shop worker, an assistant manager for a discount store, and a daycare worker. (Tr. at 41, 134-40, 161-62.)

The Medical Record

The undersigned has reviewed all the evidence of record, including the medical evidence of record, and briefly will address that evidence.

On April 5, 2006, Claimant reported to her primary care physician, Dr. Samuel A. Muscari, D.O., and his Assistant, Kelly Karper, P.A., at Family Health Care Associates, Inc., that she had been experiencing pain in her hands, feet, and toes, and that at times, she could not wear shoes due to the pain. (Tr. at 15, 336.) On June 28, 2006, Dr. Muscari diagnosed osteoarthritis and knee pain, prescribed Darvocet for pain, ordered blood work for rheumatoid arthritis, and referred Claimant to Dr. Wassim Saikali, M.D., a board certified rheumatologist. (Tr. at 15-16, 333.)

Claimant treated with Dr. Saikali from August 16, 2006, through December 4, 2007, on referral from Dr. Muscari. (Tr. at 373-83.) On August 16, 2006, Dr. Saikali diagnosed very early osteoarthritis of the right hip, most likely bursitis of the shoulder, and mild osteoarthritis of the knee. (Tr. at 382-83.) He noted that clinically, she does not have rheumatoid arthritis. (Tr. at 381.)

One month later, Claimant continued to complain of right hip pain and reported that Relafen helped relieve left knee and hand pain. (Tr. at 380.) Nevertheless, Claimant continued to have mobility

4

problems and limping due to right hip problems. (Id.) She denied any numbness or tingling. (Id.) On exam, Claimant had full range of right hip motion with pain in the groin area and mild tenderness over the right sacroiliac area. (Id.) Dr. Saikali assessed right hip pain, persistent despite taking Relafen. (Id.) He noted that her "[d]egree of pain is more than the objective findings." (Id.) Dr. Saikali explained that if the MRI of her hip was normal, there was nothing else he could offer her except exercise and weight loss. (Id.)

On September 28, 2006, Dr. Marcel Lambrechts, M.D., a state agency reviewing physician, completed a form Physical RFC Assessment, on which he opined that Claimant was capable of performing light exertional level work with occasional postural limitations and limitations in reaching in all directions due to bursitis of the right shoulder. (Tr. at 254-61.) He further opined that Claimant should avoid concentrated exposure to extreme cold, humidity, vibration, and hazards. (Tr. at 258.) Dr. Lambrechts, noted that Claimant's symptoms seemed "quite magnified," and noted that x-rays of her right hip and left knee showed only early arthritis and that her ankle problems may have come from her obesity. (Tr. at 259.) He noted that her activities included child and infant care, preparing full meals, doing light housework and laundry, going out once a day, driving, shopping several times a week, paying bills, doing gardening and crafts, attending church, visiting family and talking on the phone, and attending her children's sporting events. (Id.) In reaching his conclusions, Dr. Lambrechts considered Dr. Saikali's treatment notes in August 2006 and treatment notes from Family Healthcare in June and August 2006. (Tr. at 261.)

The x-rays of Claimant's right hip, dated October 5, 2006, revealed no evidence of arthritis or bone densities. (Tr. at 319.) The MRI however, revealed a small to medium-size joint effusion and an abnormal signal in the superior portion of the acetabulum, consistent with bone bruise/marrow edema. (Tr. at 318.) X-rays of her left knee were normal. (Tr. at 315.)

On October 11, 2006, Claimant continued to complain to Dr. Saikali of right hip pain, which was worse with ambulation on the right side. (Tr. at 376.) Though her right hip was tender to range of motion, there was no swelling of her joints. (Id.) Dr. Saikali assessed monoarthritis in the right hip without any history of trauma or injury. (Id.)

Dr. Muscari referred Claimant to Dr. Frederick B. Morgan, D.O., an orthopedist, on October 16, 2006. (Tr. at 279.) On October 16, 2006, Claimant reported right hip pain with a two to three year history, which was worsened with activities. (Tr. at 278.) She also reported groin pain, which was worse with motion. (Id.) Claimant rated her pain at a level four out of ten. (Id.) Dr. Morgan noted that the MRI of her right hip revealed some fluid within the joint itself. (Id.) On examination, Claimant had a stable and level pelvis; normal reflexes, sensation, and motor function; and intact distal pulses. (Tr. at 279.) Rotation of her right hip produced groin pain. (Id.) Dr. Morgan diagnosed right hip pain with positive MRI for effusion. (Tr. at 281.) On October 19, 2006, Dr. David L. Groten, M.D., at Princeton Community Hospital, aspirated/injected Claimant's effusion of her right hip. (Tr. at 316-17.)

Claimant returned to Dr. Morgan on November 3, 2006, and reported groin and buttocks pain, with radiation down the left leg. (Tr. at 277.) Examination remained unchanged, except that right hip rotation did not reproduce groin pain. (Id.) Dr. Morgan ordered an EMG and nerve conduction study. (Id.) On November 27, 2006, Dr. Morgan re-examined Claimant and noted that the EMG of Claimant's lower extremity was normal. (Tr. at 276.) Neurovascular examination was normal and Dr. Morgan noted that rotation of the right hip produced pain. (Id.) Dr. Morgan noted that he would refer Claimant to a university for further evaluation. (Id.) That same day, Dr. Morgan issued Claimant a note, stating:

> The above patient does not have my permission to return to work/school. The patient has been under my care from 10/16/2006 to 11/27/2006 at which time she is completely unable to perform her duties.
> The patient has the following restrictions:
> Moderate to severe hip pain, walks with a limp, and it gives out at times.

Cannot stand, sit or walk very long.

(Tr. at 327.)

Claimant was next examined by Dr. Saikali on January 31, 2007, at which time she reported that her hip was better with Prednisone, but that she had right hand pain with some numbness. (Tr. at 374.) On examination, Claimant's left hip was tender with decreased range of motion. (Id.)Dr. Saikali again diagnosed monoarthritis, which he opined could be early inflammatory arthritis despite the negative test results. (Id.) He also agreed with Dr. Morgan that an arthroscopic evaluation was necessary to drain the fluids from her right hip. (Id.)

On February 20, 2007, Claimant was examined by Dr. S. Brett Whitfield, M.D., an orthopaedic surgeon, for complaints of right hip pain. (Tr. at 16, 280-81.) On examination, Dr. Whitfield noted that Claimant had a normal gait, unremarkable ease in ascending and descending the exam table, tenderness in the trochanteric region of the right hip, and normal ease in sitting and standing. (Tr. at 16, 280.) Though Claimant had normal range of right hip motion, she experienced mild pain. (Id.) Dr. Whitfield also noted that she had no neurologic deficit and intact circulation. (Id.) He assessed right hip trochanteric bursitis and injected her right hip with a pain reliever. (Id.) Claimant had 80% relief of pain after the injection. (Tr. at 16, 281.)

On April 17, 2007, Claimant called Dr. Whitfield's office and advised that the injection helped her pain for a two week period but that the pain had worsened. (Tr. at 16, 281.) Claimant also advised that she was filing for disability benefits. (Id.) On April 18, 2007, Dr. Whitfield wrote "that because she is filing for disability she doesn't need to see him anymore since she has given up on treatment." (Id.)

On May 17, 2007, Dr. Rogelio Lim, M.D., another state agency reviewing physician, completed a form Physical RFC Assessment, on which he opined that Claimant was capable of

7

performing light exertional level work with occasional postural limitations and an avoidance of concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 285-92.) Dr. Lim opined that Claimant's symptoms were credible in part because the medical record failed to support any limitation of a disabling degree. (Tr. at 290.) In reaching this decision, Dr. Lim considered treatment records in November 2006 and January 2007, and on January 31, 2007 and in February 2007. (Tr. at 292.)

On June 27, 2007, Claimant was examined by Dennis M. Small, D.O., of the Robert C. Byrd Clinic, at the referral of Robert Johnson, P.A., in Dr. Muscari's office. (Tr. at 346-47.) Claimant reported pain all over her body with cracking and popping in her joints. (Tr. at 346.) Though she complained of pain in her knees, Dr. Small noted that x-rays were normal. (Id.) She reported that most of her pain began after her last child was born. (Id.) On examination, Dr. Small noted that Claimant's motor strength was normal and that she had good grip strength in all extremities. (Tr. at 347.) Claimant was able to bend, touch her toes, and come back up. (Tr. at 346.) She was able to bend to either side, and she complained of pain almost anywhere she was touched. (Id.) Dr. Small advised Claimant that he knew "of no disease that presents with numbness of the entire body when you lie down at night." (Tr. at 347.) He opined that given the timing of onset of Claimant's symptoms, together with it having been an unwanted pregnancy, her symptoms could have been related to postpartum depression. (Id.) He further opined that she had a somatization disorder and that it was unlikely she had rheumatoid arthritis given the absence of inflammatory markers. (Id.) Dr. Small assessed somatization disorder, hypertension, morbid obesity, and GERD by history, and recommended a psychiatric evaluation for somatization disorder and depression. (Id.)

On her Disability Report - Appeal, submitted to the State agency on July 12, 2007, Claimant reported that she suffered from severe depression, which caused fatigue. (Tr. at 207.) She further

reported that her leg pain had worsened, her right hip and left knee occasionally went out on her, she limped, had problems with her ankles swelling, she had crying spells and felt unhappy and sad, she did not want to talk to anyone, she was unmotivated to do anything, and she had difficulty getting dressed due to joint pain. (Id.) In a Function Report - Adult, dated August 15, 2007, Claimant indicated that she could pay bills, count change, handle a savings account, and use a checkbook or money order, but that as her depression and stress levels increased, her ability to perform these functions decreased. (Tr. at 188.) She also reported that her depression resulted in a decreased attention span. (Tr. at 190.)

Dr. Lambrechts completed a further form Physical RFC Assessment on September 4, 2007, on which he opined that Claimant was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently, standing or walking at least two hours in an eight-hour workday, sitting about six hours in an eight-hour workday, and pushing and pulling without any limitation. (Tr .at 365-72.) Dr. Lambrechts noted that Claimant's right hip was painful and that she walked with a mild limp. (Tr. at 366.) He therefore opined that two to three hours of standing or walking in an eight-hour shift "would be the most she can endure." (Id.) He further opined that Claimant could occasionally climb, balance, stoop, kneel, crouch, and crawl, and could frequently stoop. (Tr. at 367.) Dr. Lambrechts noted that Claimant should avoid concentrated exposure to vibration and hazards. (Tr. at 369.) He reported that although Claimant had many symptoms, "almost none [were] supported by medical findings. (Tr. at 370.) Dr. Lambrechts therefore opined that she was credible only in part. (Id.) In formulating his opinions, Dr. Lambrechts considered Dr. Morgan's November 27, 2006, opinion that Claimant had moderate to severe hip pain, walked with a limp, that her leg gave out on her at times, and that she could not sit, stand, or walk for very long. (Tr. at 371.) Dr. Lambrechts indicated, however, that his conclusions regarding Claimant's limitations and restrictions were not significantly different from his findings. (Id.) Dr. Lambrechts further considered the October 5, 2006, MRI of

9

Claimant's right hip and pelvis; Dr. Saikali's January 31, 2007, treatment notes; Dr. Whitfield's treatment notes on February 20, 2007; x-rays of her left knee on June 15, 2007; and Dr. Small's June 27, 2007, treatment notes. (Tr. at 372.)

On December 4, 2007, Claimant returned to Dr. Saikali for re-evaluation and follow-up. (Tr. at 373.) Dr. Saikali noted Claimant's history of hip problems and indicated that she then was having generalized aches and pains in multiple joints involving the neck, shoulders, and arms associated with stiffness and soreness. (Id.) She reported that she was feeling tired and fatigued all the time and was not sleeping well at night. (Id.) Dr. Saikali noted that Dr. Muscari had diagnosed her with fibromyalgia and prescribed Lyrica, which she could not tolerate. (Id.) Dr. Saikali further noted that Claimant was feeling depressed and on the depression scale, she was under severe depression. (Id.) On examination, Claimant presented with tenderness in the trapezia nuchal area and lateral epicondyle. (Id.) Dr. Saikali diagnosed fibromyalgia, polyarthralgias, and symptoms of carpal tunnel syndrome. (Id.) He prescribed 300mg Neurontin, Darvocet for pain and 15mg Resteril for insomnia, and increased her Lexapro to 20 mg. (Id.) Dr. Saikali advised Claimant to increase her activity and stretching exercises. (Id.)

Kelly Karper, P.A., of Family Healthcare Associates, completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical), on May 19, 2008. (Tr. at 389-93.) Ms. Karper opined that Claimant was capable of lifting and carrying less than three pounds and could not perform repetitive movements. (Tr. at 390.) Kelly Karper further opined that Claimant could walk less than ten minutes in an eight-hour workday; sit for less than one hour in an eight-hour workday; could never climb, balance, stoop, crouch, kneel, or crawl; and occasionally could balance.  (Tr. at 391.) Due to weakness and pain with movement, Ms. Karper indicated that Claimant's ability to reach, handle, push, and pull were affected. (Id.) She further opined that Claimant had the following environmental restrictions: heights, moving machinery, temperature extremes, and vibration. (Id.) She noted that

10

Claimant was able to walk as tolerated, but indicated that her pain usually was remained at a level seven or eight out of ten. (Id.)

Claimant submitted additional evidence to the Appeals Council. In a treatment note dated May 14, 2008, Dr. Muscari diagnosed fibromyalgia, for which she was being treated by Dr. Brick. (Tr. at 395.) A treatment note from Dr. Muscari, dated May 14, 2008, indicates a diagnosis of fibromyalgia, as assessed by Dr. Brick. (Tr. at 395.) A September 5, 2008, treatment note from Dr. Brick indicates that Claimant reported continued pain around her shoulder blades, hip, neck, and elbows. (Tr. at 398.) Dr. Brick noted that Flexeril helped Claimant sleep but that she could not tolerate it. (Id.) More than half a tablet of Flexeril caused her to be too groggy the next day. (Id.) On exam, Dr. Brick found "lots of tender flesh typical FMS [fibromyalgia syndrome] spots." (Id.) Claimant reported pain with shoulder motions, but Dr. Brick noted that she moved well. (Id.) Claimant also reported groin pain with motion in the right hip. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to find Claimant's fibromyalgia as a severe impairment. (Document No. 10 at 7-8.) Claimant notes that on December 6, 2007, a board certified rheumatologist, Dr. Saikali, diagnosed fibromyalgia. (Id. at 7.) At that time, Claimant was experiencing generalized aches and pains, as well as stiffness and soreness in her neck, shoulders, and arms. (Id.) Subsequent to Dr. Saikali's treatment, Claimant notes that she treated with Dr. Brick, who also believed that Claimant suffered from fibromyalgia. (Id. at 7-8.) Dr. Brick noted on September 8, 2008, that Claimant had tender flesh spots, which were typical of fibromyalgia. (Id. at 8.)

Claimant further alleges that the ALJ erred in concluding that her symptoms of fibromyalgia were not credible. (Document No. 10 at 8-10.) Claimant asserts that because the ALJ "erroneously

11

concluded that [Claimant] did not suffer from fibromyalgia, a medically determinable impairment that could cause fatigue and disturbed sleep, his finding that her testimony concerning her symptoms was not credible is based on an improper foundation." (<u>Id</u> at 8.) The Commissioner asserts that the ALJ properly found that Claimant overstated the limiting effects of her symptoms, and therefore, that the ALJ's credibility analysis is supported by substantial evidence. (Document No. 11 at 10-15.)

Finally, Claimant alleges that the ALJ erred in relying on the Medical-Vocational Guidelines to direct a decision of "not disabled." (Document No. 10 at 7.) Claimant asserts that she suffered from fatigue, sleep difficulties, and depression due to fibromyalgia, which were nonexertional impairments. (<u>Id.</u> at 11-12.) Finally, Claimant asserts that she was unable to perform a full range of sedentary work. (<u>Id.</u> at 12.) Consequently, Claimant alleges that the ALJ could not rely on the Medical-Vocational Guidelines solely to direct a decision in this case. (<u>Id.</u>)

The Commissioner asserts in response that SSR 96-9p specifically states that "the inability to perform a full range of sedentary work does not necessarily equate with a finding of 'disabled.'" (Document no. 11 at 16-17.) Thus, the Commissioner asserts that the fact that Claimant could not perform a full range of sedentary work did not preclude the ALJ from relying on the Medical-Vocational Guidelines because her exertional and non-exertional limitations did not erode the sedentary occupational base substantially. (<u>Id.</u>)

In Reply, Claimant asserts that the Commissioner's reliance on SSR 96-9p is in error because the Ruling is not binding on this Court. (Document No. 12 at 1.) Furthermore, Claimant asserts that the Commissioner's interpretation of the Ruling is incorrect because it does not eliminate the need of vocational expert testimony. (<u>Id.</u> at 1-2.) Claimant notes that when the Ruling applies, the ALJ must cite examples of the occupations the claimant can perform, as well as the regional information for each specific occupation. (<u>Id.</u> at 2.) Finally, Claimant concedes that an individual with the RFC as stated

by the ALJ is able to perform a full range of sedentary work. (Id.) However, Claimant asserts that the ALJ failed to acknowledge additional limitations, including fatigue, generalized joint pains, and depression. (Id.)

Analysis.

1. Severe Impairments.

Claimant first alleges that the ALJ erred in not finding fibromyalgia as a severe impairment. (Document No. 10 at 7-8.) To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c);  416.920(c) (2008). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original); see also SSR 85-28 (An impairment is considered not severe "when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered."). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment

13

is made at the second step of the sequential analysis.

In his decision, the ALJ specifically discussed the medical record pertaining to fibromyalgia in finding that it was not a severe impairment. (Tr. at 17-18.) The evidence before the ALJ reveals that the first mention of fibromyalgia in the record was in December 2007, when Dr. Saikali made the diagnosis based upon Dr. Muscari's prior diagnosis, as reported by Claimant. (Tr. at 373.) Dr. Saikali noted only generalized aches and pains in multiple joints involving the neck, shoulders, and arms. (Id.) Dr. Muscari's treatment records up to that point in time, however, did not reflect a diagnosis of fibromyalgia. (Tr. at 320-41.) The next mention of fibromyalgia in the record was in May 2008, when Dr. Muscari made the diagnosis and noted that Claimant was being treated by Dr. Brick. (Tr. at 395.) There were no medical records from Dr. Brick before the ALJ. (Tr. at 17-18.) As noted above, a severe impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, in addition to a claimant's subjective symptoms. See 20 C.F.R. §§ 404.1508, 404.1528 (2008). Consistent with the ALJ's decision, it appears that the diagnoses of fibromyalgia by Drs. Muscari and Saikali were supported primarily by Claimant's subjective complaints. The medical record contains minimal objective evidence. The Commissioner correctly points out that the medical record does not include any documentation regarding pain in eleven of the eighteen tender point sites on digital palpation. The American College of Rheumatology ("ACR") established criteria for diagnosing fibromyalgia in 1990. The American College of Rheumatology, *Criteria for the Classification of Fibromyalgia*, 33 Arthritis and Rheumatism 160, 171 (1990). The criteria for the classification of fibromyalgia are (1) a history of widespread pain and (2) pain in 11 of 18 tender point sites on digital palpation. Id. Pain is considered widespread when it exists on both sides of the body and above and below the waist. Id. In May 2010, the ACR proposed new, less stringent criteria for the classification of fibromyalgia. The American College of Rheumatology, *Preliminary Diagnostic*

14

*Criteria for Fibromyalgia and Measurement of Symptom Severity*, 62 Arthritis Care & Research 600 (2010).These preliminary and provisional criteria of the ACR include widespread pain lasting at least three months and no other underlying condition that might be causing the pain. See http://www.mayoclinic.com/health/fibromyalgia/DS00079/METHOD=print&DSECTION=all (last viewed Feb. 7, 2011). These new criteria, however, were not available to the ALJ when he considered Claimant's claims.

The undersigned finds that the based on the evidence before the ALJ, the ALJ's decision that fibromyalgia was not a severe impairment is supported by substantial evidence. The medical record does not contain the criteria for the diagnosis of fibromyalgia. There is no mention by Claimant's treating physicians that Claimant had pain in 11 of the 18 tender point sites. Rather, Dr. Saikali noted only generalized aches and pains in the upper portion of her body when he made the diagnosis. Though Claimant submitted new evidence to the Appeals Council,[2] which reflects a diagnosis of fibromyalgia by Dr. Brick, again, there is no objective evidence to support the diagnosis. In September 2008, Dr. Brick noted Claimant's complaints of pain around her shoulder blades, hip, neck, and elbows. (Tr. at 398.) On examination of Claimant, Dr. Brick observed "lots of tender flesh typical FMS spots." (Id.) However, there is no indication as to their number or location. The ALJ therefore, found that the diagnosis of fibromyalgia by Drs. Brick, Saikali, and Muscari was consistent with Claimant's alleged

---

[2] To justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985). In *Borders*, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met:  (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.  *Id.*

symptoms, but appeared on the record as a matter of medical history and was not reported by an acceptable medical source based on objective clinical or laboratory findings that the physician observed. (Tr. at 18.) The ALJ therefore concluded that "[a]t most, the medical evidence establishe[d] polyarthralgia of undetermined etiology, which was the [C]laimant's treating diagnosis of record." (Id.)

Based on the foregoing, the Court is constrained to find that the diagnosis of fibromyalgia was based primarily on Claimant subjective complaints. There are no examination notes of record to support a finding that Claimant met the diagnostic criteria for fibromyalgia. Accordingly, the undersigned finds that the new evidence submitted to the Appeals Council neither was material nor would have changed the ALJ's decision, and therefore, that the ALJ's decision regarding the severity of fibromyalgia is supported by substantial evidence.

2. Pain and Credibility Analysis.

Claimant next alleges that the ALJ erred in assessing her symptoms and credibility. (Document No. 10 at 8-10.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2008); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative.

16

Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2008). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:
>
> > (i) Your daily activities;
> >
> > (ii) The location, duration, frequency, and intensity of your pain or other symptoms.
> >
> > (iii) Precipitating and aggravating factors;
> >
> > (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> >
> > (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> >
> > (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and
> >
> > (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2008).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms,

17

the symptoms cannot be found to affect the individual's ability to do basic work activities.

       Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or]

redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 21-22.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 21.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 21-22.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 22.)

The ALJ first considered Claimant's subjective symptoms in assessing her credibility. (Tr. at 21.) Claimant testified that she had severe right hip pain, that her hip went out five or six times a day causing her to fall, and that she could not climb stairs very well. (Tr. at 21, 34, 38, 40.) The ALJ then assessed Claimant's credibility by reviewing the factors set forth in the Regulations. The ALJ first noted that Dr. Saikali opined that the degree of Claimant's pain was more than the objective findings. (Tr. at 21, 380.) For instance, Claimant was prescribed Darvocet in June 2006, for pain, but there was no mention in the record that she was maintained on a narcotic analgesic. (Tr. at 22.) Rather, Claimant was prescribed non-steroidal anti-inflammatory drugs (Relafen) and Ultram for pain. (Tr. at 22.) Darvocet was later prescribed but not due to an increase in pain, but because the Ultram made Claimant sleepy. (Tr. at 22.) Regarding further treatment, Claimant failed to pursue the

19

recommendations of Drs. Morgan and Whitfield that she have further evaluation. (Tr. at 22.) In February 2007, Dr. Whitfield classified Claimant's hip pain as only mild in nature. (Tr. at 22, 280.) Finally, the ALJ noted that despite Claimant's reports of subjective symptoms and pain to the various physicians, there was no indication of motor loss, reflex deficits, or focal neurological deficits. (Id.) Additionally, the ALJ considered Claimant's activities of daily living. (Tr. at 19-20, 22-23.)

The ALJ further considered the opinion evidence of record. (Tr. at 22-23.) The ALJ gave significant weight to the opinions of the state agency medical consultants, which supported the finding that Claimant's right shoulder pain did not persist for the requisite duration at a level that significantly limited her ability to work. (Tr. at 23.) These medical consultants consistently found that Claimant was able to perform work at the light level of exertion, with limitations in standing and walking. (Id.) The ALJ failed to give significant weight to Kelly Harper's opinion because the limitations were inconsistent with Claimant's reported activities of daily living. (Tr. at 22.) Though Dr. Morgan issued Claimant a work excuse, which indicated that she had moderate to severe hip pain and that her hip gave out on her, the ALJ found that his treatment notes did not confirm hip instability. (Tr. at 22, 276-77.) Furthermore, a month prior to the issuance of the work excuse, Claimant reported pain at only a level four out of ten, which as the ALJ found, placed her pain in a mild to moderate range and not a moderate to severe range. (Tr. at 22, 278.) Finally, the ALJ noted that Dr. Morgan did not prescribe any pain medications, despite his statement that she suffered moderate to severe pain. (Tr. at 22.) The ALJ therefore concluded that Dr. Morgan most likely issued the work excuse under the assumption that she would pursue further evaluation, which she did not. (Id.) Claimant further takes issue with Dr. Lambrechts having ignored Dr. Morgan's opinion that Claimant could not sit for a very long period of time. (Document No. 10 at 10.) Claimant correctly points out that Dr. Lambrechts indicated that his conclusions and opinions were not significantly different from those of Dr. Morgan. (Tr. at 371.) Dr.

20

Lambrechts however, indicated that Claimant could sit for six hours in an eight-hour workday as opposed to Dr. Morgan's opinion that she could not sit very long. (Tr. at 366, 278.) Despite having failed to explain this specific inconsistency, Dr. Lambrechts found that many of Claimant's symptoms were not supported by medical findings. As the ALJ noted, his opinion was consistent with the medical evidence. Accordingly, the ALJ having found that Dr. Morgan's restrictions were not supported by his own findings and that Claimant was not credible entirely, the undersigned therefore finds that any error that may have been committed in failing to reconcile Dr. Lambrechts and Dr. Morgan's differing opinions is harmless. The medical record does not support a finding that Claimant could not sit for at least six hours in an eight-hour workday. The undersigned therefore finds that contrary to Claimant's assertion, the ALJ properly considered Dr. Morgan's opinion as stated in his work excuse.

Accordingly, the undersigned finds that the ALJ's credibility assessment conformed to the factors set forth in the Regulations. Contrary to Claimant's allegation, the ALJ properly found that fibromyalgia was not a severe impairment, and therefore, the credibility assessment was not flawed for that reason. The undersigned therefore finds that the ALJ's credibility assessment is supported by substantial evidence.

3. Medical-Vocational Guidelines.

Finally, Claimant alleges that because she has nonexertional limitations, the ALJ erred in relying on Medical Vocational Guideline Rules 201.28 and 201.29, to find that she is not disabled under the Regulations. (Document No. 10 at 7, 11-12.) As stated above, at step five of the sequential analysis, the Commissioner bears the burden of proving that the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education, work experience, skills, and physical shortcomings. 20 C.F.R. §§ 404.1520(f); 416.920(f) (2008). One way to meet this burden is through the use of the grids. The

Regulations establish "grids" which "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." Grant v. Schweiker, 699 F.2d 189, 191-92 (4th Cir. 1983); see generally 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2008). Each grid considers the strength or "exertional" component of a claimant's disability in determining whether jobs exist that claimant could perform in light of the vocational factors. Grant, 191-92; 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, §§ 200.00-204.00 (2008). In a case where the claimant has only exertional impairments, the grids may be applied and vocational expert testimony is not required. See Hays v. Sullivan, 907 F.2d 1453, 1458 (4th Cir. 1990).

The Regulations describe both exertional and nonexertional limitations. An exertional limitation is one which manifests itself by limitations in meeting the strength requirements of a job. See 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, § 200.00(e) (2008); Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983). A nonexertional limitation is a limitation that is present regardless of whether the claimant is attempting to perform the physical requirements of a job, and would include mental retardation, mental illness, blindness, deafness, or alcoholism. Id. Nonexertional limitations are "present at all times in a claimant's life, whether during exertion or rest." Gory, 712 F.2d at 930. "When a claimant suffers from exertional limitations and the facts of his vocational profile meet all the criteria of a particular rule in the tables of Appendix 2, that rule directs the conclusion to be drawn [whether the claimant is disabled or not disabled]." Id. When a claimant has both exertional and nonexertional limitations, the grids' rules are not conclusive, and may only serve as guidelines for decision. See Gory, 712 F.2d at 931; 20 C.F.R. Chapter III, Pt. 404, Subpt. P, App.2, § 200.00(e)(2) (2003). In a case where the claimant has only exertional impairments, the grids may be applied and vocational expert testimony is not required. See Hays v. Sullivan, 907 F.2d 1453, 1458 (4th Cir. 1990).

The Fourth Circuit has recognized "that not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids." Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989). The proper inquiry "is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." Id. In this matter, the undersigned finds that the ALJ did not err in applying the grids in view of the

As previously discussed, the ALJ found that fibromyalgia was not a severe impairment essentially because it was not diagnosed properly pursuant to the ACR's criteria. Claimant asserts that fibromyalgia, however, caused her fatigue, generalized joint pains, and depression. The ALJ also found that Claimant's depression was not a severe impairment, a finding which Claimant does not dispute. (Tr. at 19.) Claimant was neither restricted in any way by her treating physicians due to these three conditions, nor did any medical source limit her functional abilities based on these three conditions. To the extent that the ALJ found Claimant's subjective symptoms credible, he accounted for her generalized joint pains in assessing her RFC and limiting her ability to stand and walk, to lift and carry, and to perform occasional postural activities. (Tr. at 20-21.) Claimant has not demonstrated specifically how she is limited from performing work at the RFC assessed by the ALJ due to her fatigue, generalized joint pains, and depression. Thus, the undersigned finds that the ALJ's finding that fatigue, generalized joint pains, and depression did not affect significantly her RFC is supported by substantial evidence. Consequently, the ALJ's reliance on the Medical-Vocational Guidelines and foregoing the testimony of a VE, also is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 11.), **AFFIRM** the final decision of the

23

Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: March 1, 2011.

R. Clarke VanDervort
United States Magistrate Judge

24